UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| SHANNON K. LYNCH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Cause No. 1:11-cv-00861-WTL-DML |
| ) | |
| MICHAEL J. ASTRUE, Commissioner of ) | |
| the Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Shannon K. Lynch requests judicial review of the final decision of Defendant Michael J. Astrue, Commissioner of the Social Security Administration ("Commissioner"), denying her application for Supplemental Insurance Benefits ("SSI") under XVI of the Social Security Act ("the Act"). The Court now rules as follows.

### I.   PROCEDURAL BACKGROUND

Lynch filed for SSI on January 30, 2007, alleging she became disabled on August 12, 2005, primarily due to degenerative disc disease, depression, anxiety, gastroesophageal reflux disease, and hypertension. Lynch's applications were denied initially on May 1, 2007, and again on reconsideration on June 29, 2007. Following the denial on reconsideration, Lynch requested and received a hearing in front of an Administrative Law Judge ("ALJ"). A video hearing, during which Lynch was represented by an attorney, was held on August 24, 2009. ALJ Deborah A. Arnold presided over the hearing from Falls Church, Virginia. Arnold issued her decision denying Lynch's application on February 16, 2010. The Appeals Council denied a request for review on May 19, 2011, after which Lynch filed this timely appeal.

## II.  SUBSTANTIVE BACKGROUND

### A.  Medical Records

At the age of 37, Lynch applied for supplemental insurance benefits, alleging that she was disabled due to degenerative disc disease, depression, anxiety, gastroesophageal reflux disease, and hypertension. She alleges an onset date of August 12, 2005. Relevant portions of her medical records are detailed below.

Lynch underwent a lumbar spine MRI on January 7, 2004, which revealed disc protrusion within the left subarticular recess at the L4-5 level in mild central canal stenosis and impingement on the descending L5 nerve root at this level as well as mild congenital stenosis at the L4-5 and L5-S1 levels.

On April 23, 2004, Lynch sought treatment with orthopedic surgeon Dr. Neil Levine. She complained of pain in her lower back with pain radiating down the left leg for the past 5-6 years. On examination, there was some tenderness from L4 to S1 as well as in the left sciatic notch. Range of motion in her lumbosacral spine was good, and she had no sensory or motor deficit in either lower extremity. She had full range of motion in both hips with a negative lasegues test and negative bowstring sign on the right with only pulling on straight leg raising of the right leg. However, on straight leg raising of the left leg she did have a positive lasegues test and she had a positive bowstring sign as well. Dr. Levine also reiterated the results of the MRI from January 2004. She was then referred for an epidural steroid injection.

Lynch followed up with Dr. Levine on May 14, 2004. At that time, Lynch reported that the epidural steroid injection had significantly relieved her leg pain. However, she complained of discomfort in her neck and upper back, with tightness and muscle spasm. She had good motion of the cervical spine, but discomfort on both lateral rotation and lateral bending to

the left and right sides. She also had tightness and tenderness in the upper back. She was started on a muscle relaxant and referred for a second epidural injection due to the sciatic nerve irritation. She was also given a neck and lower back exercise program. Dr. Levine explained to her that while she did have some degenerative changes in her lower back involving the facet joints, which for a younger person is abnormal, by improving her body mechanics the hope was to take stress off her back and help in the long run.

On June 26, 2004, Lynch was seen by Dr. Levine in follow-up after her second epidural injection on May 27, 2004. She had been doing well until three days earlier when she began to experience increasing pain in her lower back and pain in her left hip. On exam she presented somewhat distraught, and there was a trigger point in the right paraspinal area roughly at the L2 level. Also, despite the pain in her left hip, she had full range of motion of both hips. Dr. Levine opined she was suffering a back strain and opted to perform another epidural steroid injection.

On September 20, 2005, Lynch was seen again by Dr. Levine. On this visit, Lynch stated that she had increasing discomfort radiating down the left leg to the foot with tingling and numbness in the foot. On examination she did not appear to be in acute distress and walked with a normal gait. There was some mild tenderness in the left paraspinal area from L4 to S1, and tenderness in the left sciatic notch. The neurological exam revealed questionable decreased sensation following the L5 nerve root and weakness in the peroneal muscles. She had good strength but was not able to maintain it for any period of time. There was evidence of sciatic nerve irritation, and her earlier January 2004 MRI revealed a disc protrusion slightly to the left side at L4-5 and evidence of stenosis at L5-S1. After discussion, Dr. Levine decided to treat her with another epidural steroid injection. A left L5-S1 transforaminal steroid epidural injection was performed on September 22, 2005.

On May 8, 2006, Lynch was seen at the Center for Pain Management by Dr. Edward Kowlowitz for her lumbar pain radiating to her left lower extremity. She described the pain as aching, burning, shooting, severe, and constant. Her associated symptoms had been depressive features, sleep disturbance, decreased interest engaging in pleasurable activities, feeling agitated, slowed down, chronic fatigue, irritability, anxiety, nervousness, and also prolonged sitting and standing exacerbate her pain. Her current treatment regimen of Lortab had not been helpful. Previous invasive interventions of epidural injections also had not been helpful, and physical therapy only exacerbated her discomfort. Lynch told Dr. Kowlowitz that she had had a period of panic attacks where she cried everyday. Dr. Kowlowitz diagnosed lumbar spondylosis, lumbar radiculopathy, and depression, and recommended that a lumbar MRI be performed before proceeding with any specific plans of care.

Lynch underwent a lumbar MRI on May 11, 2006, which revealed a small central disc extrusion with inferior extension at the L4-L5 level, producing mild central stenosis and contact with but no displacement of the left L5 nerve root. At the L5-S1 level, the MRI revealed a small right central paracentral disc protrusion producing deformity of the anterior thecal sac without displacement of nerve roots.

Lynch was seen in follow-up for her pain issues on May 17, 2006. Dr. Kowlowitz reviewed the MRI results and noted that Lynch had significant two-level disc disease with no radicular right-sided pain as well as left. She was scheduled for a high-volume caudal.

On June 6, 2006, Lynch underwent a high-volume caudal and lumbosacral epidurogram for her central protrusion at L4-5 and L5-S1 with right paracentral protrusion.

At the request of the Disability Determination Bureau, Lynch was seen for a mental

status examination on June 26, 2006. Her affect was within normal limits; however, she did appear somewhat depressed. She rated her subjective feeling of depression, on a scale of 0-10, to be an "8." Lynch reported that she was able to cook, do light cleaning, do laundry with assistance and shop with assistance. She also often needed help getting out of bed and getting dressed. She reported reading and surfing the internet for fun. After the mental status exam, Dr. Henry diagnosed Lynch with Depressive Disorder NOS and assigned her a GAF of 75.

On March 2, 2007, K. Tucker of the Social Security Administration interviewed Ms. Lynch face-to-face and observed her to be uncomfortable sitting still for a long period of time.

Lynch was seen by Dr. Yasir Akhtar on April 16, 2007, at the request of the Social Security Administration for a physical examination. She told the doctor that she had sciatic pain in her left leg and that her pain was worse in the lower back and was occasionally accompanied with toe numbness at times. There were no aggravating or relieving factors. She stated that the most she could walk was half a block and then it started hurting more, she could sit at most for five minutes and then she needed to change positions, and she could not stand for more than five minutes or do any stairs at all. She was able to stand and walk without the need for assistive measures, had normal gait and station, no perceived difficulty in walking on heels, toes, or tandem walking, and squatted completely without difficulty. She had full range of motion in all joints, without evidence of deformity, effusion, or inflammation. She did have pain in her left hip on flexion beyond 90 degrees. Dr. Akhtar was unable to test for straight leg raising due to pain already present. The doctor noted that Lynch had tenderness in the L4-L5 area as well as in the left hip area. She also had pain with extension of her lumbar spine beyond 15 degrees. Her neurological exam was normal. Dr. Akhtar's impression was hypertension, hyperlipidemia, and worsening lower back pain with radiation to the left knee and symptoms of sciatica.

A Physical Residual Functional Capacity Assessment Form was completed by Dr. M. Ruiz on April 30, 2007. Dr. Ruiz assessed Lynch as capable of occasionally lifting and/or carrying twenty pounds, frequently ten pounds. The doctor opined that she could sit, stand, and/or walk about six hours in an eight-hour workday, and had unlimited ability to push and/or pull. She could perform all postural changes (climb, balance, stoop, kneel, crouch, and crawl) frequently, except that she could only occasionally climb ladders, ropes or scaffolds. Dr. Ruiz found no manipulative, visual, communicative, or environmental limitations except that she must avoid concentrated exposure to wetness and hazards such as machinery and heights. On June 28, 2007, state agency physician J.V. Corcoran reviewed Dr. Ruiz's assessment and affirmed Dr. Ruiz's findings.

A Psychiatric Review Technique form was completed on May 1, 2007, by Dr. Joelle Larsen, who found Lynch to have no medically determinable mental impairment.

On November 5, 2008, Lynch underwent another lumbar MRI for her chronic back pain. Results showed moderate left paracentral disc herniation at L4-L5 with significant posterior element hypertrophy and moderate spinal stenosis. There was associated compromise of the left lateral recess. At the L5-S1 level there was moderate central disc bulge versus disc herniation with mild impingement of the lateral recesses.

Dr. Rasaki completed a statement on August 20, 2009, noting that Lynch was seeing a doctor for chronic pain syndrome, anxiety and depression, hypertension, scoliosis and kyphoscoliosis idiopathic, panic disorder without agoraphobia, and mixed hyperlipidemia.

On December 29, 2010, Lynch was seen by Dr. Robert Gregori for an independent medical examination. Dr. Gregori performed both a record review and a physical examination. He was asked to address her history, make a diagnosis regarding her physical condition, and

render an opinion regarding her capacity to work or whether he believed she was totally and permanently disabled. At that time, Lynch stated that her pain worsened with prolonged sitting, standing, walking, bending forward and backward, and with any attempts at exercise. Pain was reduced by lying down and in the past medications and injections had also reduced her pain. Pain was always present, but of variable intensity, and it had gradually become more intense. Lynch described the pain as stabbing pain through the thoracic region from the mid-thoracic through the low thoracic region. She reported aching into the low back and leg pain that presented and progressed with standing for more than five minutes or walking more than two hundred yards. The leg pain was posterior left burning, radiating pain to the back of the knee, but not beyond. She rated her back and leg pain at 10/10. Emotionally she felt frustrated, depressed, and as if nothing could help. She felt some weakness in the legs. She had been unable to sleep well and could stand for about fifteen minutes, sit for about forty minutes, and walk for five minutes. She laid down frequently and was recumbent multiple times during the day. She did little, if any, housework and leisure activities. Lynch completed the Beck Depression Inventory and her score was 52. She did not demonstrate significant pain behaviors, and her examination was felt to be very consistent with her condition.

On further examination, Dr. Gregori noted that Lynch had decreased sharp sensation predominantly in the L5 dermatome on the left, and her gait was unremarkable. In her lumbar spine, Lynch could flex to forty degrees with increased pain. Extension was to twenty-five degrees, and lateral bending was fifteen degrees right and ten degrees left, both with pain. There was some mild spasm present, and her lumbar lordosis was reduced with a flattening of the lumbar spine. With palpation there was a trigger point identified at the right mid-thoracic paraspinals at about T6. Through the lumbar region, there was a mild step-off at L5 and she had

positive posterior anterior mobilization pain at L4-5, which recreated some of her back pain with minimal radiation to the left leg. She had sciatic notch tenderness on the left. Her straight leg raise while seated on the left was positive and while supine was positive at forty degrees; and it was negative on the right.

   Dr. Gregori's impression noted a 41-year-old woman with chronic low back and left leg pain with a history of lumbar disc disease and MRI evidence dating back to 2008 of an L4-5 and L5-S1 herniated disc with left nerve root encroachment. She had anatomical evidence on the MRI of at least moderate stenosis, and her examination signs and symptoms were all consistent with an L5-S1 radicular pattern on the left. Dr. Gregori did not recommend therapy, but he opined that an epidural steroid injection might help with pain, though not likely for the long term, and medications might help to reduce the pain, but were unlikely to allow her to return to gainful employment. Dr. Gregori further stated that "there is no doubt that she meets the criteria for disability based on the severity of her discogenic problems and the significance of her radiculitis." Dr. Gregori believed that "she has a disorder of the spine with evidence of nerve root compression characterized by neuroanatomical distribution of her pain, limitation of motion of the lumbar spine, as well as the reflexic changes and sensory changes and positive straight leg raise." Further, he stated that "there is no doubt, based on her present examination, symptoms, and findings, that she would be unable to perform even a sedentary job on a part time basis." He believed she "cannot stand comfortably for more than fifteen minutes at a time, and although she can sit for thirty or forty minutes, she would require the ability to lie down three or four times during the course of a day and would not be able to sit or alternate sit and standing for any prolonged period." He further opined that "even if she were given medication to help improve her pain and tolerance for activities . . . they would unlikely afford her the luxury of tolerating

more than three hours of activities." He also suspected that she would frequently miss work, as often as once a week, due to her condition.

On February 23, 2011, Dr. Gregori completed a Physical Residual Functional Capacity Assessment form regarding Lynch. He noted that Lynch could sit continuously for forty-five minutes, stand continuously for thirty minutes, and walk continuously for fifteen minutes. She could sit for three hours total in an eight-hour work day, stand for a total of one hour in a workday and walk for forty-five minutes in a workday. She could never lift and could only occasionally carry up to 10 pounds. She could never squat, kneel, or crawl, and could only occasionally bend, rotate, climb, reach overhead, extend arms, and flex her neck. She could use her hands for frequent grasping, pushing, pulling, and fine manipulation. She could not use her feet for frequent repetitive movements. She had mild restrictions around unprotected heights, exposure to marked changes in temperature or humidity, and driving heavy equipment. He noted that her pain interfered with sleep and caused fatigue and decreased attention. She would not be able to focus or perform cognitive tasks for more than fifteen minutes in duration due to her pain. Dr. Gregori considered Lynch's condition to be moderately severe, and diagnosed her with chronic low back pain with degenerative disc disease, disc herniation, and radiculopathy affecting her left leg. Finally, Dr. Gregori noted that Lynch's pain was consistent with the degree of lumbar disc disease and caused total and permanent disability, with the need to recline every two-three hours to get some relief.

## B.     Hearing Testimony

Lynch was 37 years old when she filed her SSI application. She has a ninth-grade education and last worked in 1995. Lynch testified that her main problem was pain from three herniated discs and radiating nerve pain down her leg. She described it as constant. She stated

that her primary care doctor told her that she was too young to undergo back surgery, and that every time she asked for a referral to a back specialist, her doctor just told her to get a wheelchair because that is likely where she would end up. She had indicated that she last received a steroid back injection in 2006, and that it helped the pain for a short time. Plaintiff testified that she took Vicodin for pain, and that she "tend[ed] to get tired and just a little dizzy sometimes" from it. She stated that she had begun to use Fentanyl patches for pain a few weeks before the administrative hearing. She stated that her medical bills were paid by the Indiana Medicaid program.

Lynch stated that she could walk for twenty-five minutes and stand for thirty minutes at a time. She indicated that she could sit for one hour at a time and that her most comfortable position was lying down. Lynch estimated that she could lift no more than ten pounds. Lynch testified that she could not do laundry or make her bed, but could clean dishes, dust, and attend her daughter's school programs and plays.

### III. APPLICABLE STANDARD

Disability is defined as "the inability to engage in any substantial gainful activity by reason of a medically determinable mental or physical impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least twelve months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate that her physical or mental limitations prevent her from doing not only her previous work, but any other kind of gainful employment that exists in the national economy, considering her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. *Weatherbee v. Astrue*, 649 F.3d 565, 568-69 (7th Cir. 2011); 20 C.F.R. § 416.920.

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, [she]is not disabled. The fifth step assesses the applicant's RFC, as well as [her] age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, [she] is not disabled.

*Weatherbee*, 649 F.3d at 569.

The ALJ's findings of fact are conclusive and must be upheld by this Court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id*., and this court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ is required to articulate only a minimal, but legitimate, justification for her acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). The ALJ must articulate her analysis of the evidence in her decision; while she "is not required to address every piece of evidence or

testimony," she must "provide some glimpse into her reasoning . . . [and] build an accurate and logical bridge from the evidence to her conclusion." *Id.*

## IV. THE ALJ'S DECISION

Applying the five-step analysis, the ALJ found that Lynch was not disabled from January 1, 2008, through the date of her decision. At step one of the analysis, the ALJ found that Lynch had not engaged in any substantial gainful activity ("SGA") since January 30, 2007, the application date. At step two, the ALJ determined that Lynch suffered from the following severe impairments: degenerative disc disease, depression, anxiety. The ALJ further found that Lynch's gastroesophageal reflux disease ("GERD") and hypertension were non-severe because they did not significantly limit Lynch's ability to do basic work activities.

At step three of the analysis, the ALJ determined that none of Lynch's severe impairments met or medically equaled a listed impairment.

At step four, the ALJ concluded that Lynch retained the RFC to perform sedentary work within the following parameters: She can lift ten pounds occasionally and less than ten pounds frequently, stand and walk for a total of two hours in an eight-hour workday, sitting the remainder of the time. She can occasionally bend; occasionally climb ladders, ropes, or scaffolds; can occasionally have interaction with others; and can perform simple, repetitive tasks. Lynch must avoid concentrated exposure to wet, slippery surfaces and unprotected heights.

The ALJ concluded that, given Lynch's RFC, she was not able to perform her past relevant work as a day worker or kitchen helper. However, considering her age, education, work experience, and RFC, the ALJ found that Lynch was capable of making a successful adjustment to other work that exists in significant numbers in the regional economy, including such

representative occupations as eyeglass assembler-lens inserter. Therefore, the ALJ determined at step five that Lynch had not been under a disability since January 30, 2007.

## V. DISCUSSION

### A. Failure to Consider Listing 1.04

Lynch contends that the ALJ's decision fails to build an accurate and logical bridge because the ALJ never explicitly discusses whether Lynch's impairments meet or medically equal Listing 1.04, "Disorders of the Spine." The Commissioner argues that, even though the ALJ did not discuss Listing 1.04, "her decision shows that she considered the record as a whole." The Court agrees with Lynch. It is exceedingly strange that the ALJ would discuss at length whether Lynch's mental impairments, which impairments the ALJ found to be non-severe, meet or medically equal a listing, while at the same time completely forgoing any analysis of Lynch's chief impairment, degenerative disc disease, which the ALJ found to be severe. Furthermore, the Commissioner's argument is unavailing; the ALJ's decision shows that she considered Lynch's *mental* impairments as a whole, but the ALJ's short, matter-of-fact chronology of just three medical treatment events (steroidal injections) in another portion of her opinion can hardly be characterized as evincing the level of analysis required under the step three determination. Therefore, on remand, the ALJ should consider the listings implicated by Lynch's physical impairments and analyze the medical record evidence against the listing requirements.

### B. Failure to Call a Medical Advisor

Lynch also argues that the ALJ's listing determination was not based on substantial evidence because the ALJ did not call a medical advisor to express an opinion as to whether Lynch's impairments equaled a listing. The Commissioner argues that a medical expert was not

13

required because state agency reviewing physicians Ruiz and Corcoran completed disability determination forms and opined that Lynch was not disabled.

It is true that an ALJ's decision to call a medical expert is discretionary, 20 C.F.R. § 416.927(f)(2)(iii), and an ALJ may rely on state agency physicians' opinions to determine disability. *Scott v. Sullivan*, 898 F.2d 519, 524 (7th Cir. 1990) (citing *Waite v. Bowen*, 819 F.2d 1356, 1360 (7th Cir. 1987)). However, in this case, the ALJ engaged in absolutely no analysis at all as to whether Lynch's degenerative disc disease met or equaled a listing, and the Court is therefore unable to determine whether the ALJ properly exercised her discretion with respect to a medical expert and whether the ALJ did in fact rely on the state agency physicians' opinions.[1] The ALJ should address this deficiency on remand.

### C. Improper Credibility Determination

The ALJ also erred, according to Lynch, when she did not fully analyze Lynch's credibility under SSR 96-7p. Once again, the Commissioner urges the Court to consider the ALJ's decision "as a whole" and therefore find that the ALJ properly considered the relevant factors.

An ALJ's assessment of the claimant's credibility is entitled to special deference and is not grounds for reversal and remand unless it is "patently wrong." *E.g.*, *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). Social Security Ruling 96-7p provides seven factors that an ALJ may consider with respect to her credibility determination: the individual's daily activities; the

---

[1] The Commissioner points out that the state agency physicians rendered opinions that were consistent with the ALJ's RFC. The ALJ does not mention those opinions in his decision, however, and therefore there is no indication that he relied on them. Therefore their existence is irrelevant to the analysis, and it was improper for the Commissioner to cite to them in his brief as evidence that supports the ALJ's decision. *See Shauger v. Astrue*, 675 F.3d 690, 695, 697 (confirming that "[o]ur review is confined to the rationales offered by the ALJ" and "the agency may not bolster the ruling with evidence the ALJ did not rely on") (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93-95 (1943)).

location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. In assessing the credibility of the claimant, the ALJ need not cite findings on every factor provided in 96-7p, but the ALJ must articulate the reasons for her decision in such a way as to "make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Brindisi v. Barnhart*, 315 F.3d 783, 787-88 (7th Cir. 2003) (citing SSR 96-7p).

Here, the ALJ measured Lynch's subjective complaints against Lynch's medical treatment history, specifically her three steroidal injections, before concluding that Lynch's symptoms were not as severe as alleged. As best the Court can tell, this conclusion is based entirely on the fact that these three injections provided some fleeting relief to Lynch, but Lynch has not undergone any further injections since 2008, instead treating only with Vicodin. This is quite a slender reed on which to balance a credibility determination. The Commissioner urges that other portions of the ALJ's opinion, where she addresses Lynch's activities of daily living, fill out the ALJ's analysis, but the Court does not agree. Activities of daily living is the only other factor addressed, and that analysis occurs within the portion of the ALJ's opinion wherein she determines whether Lynch's mental impairments meet or medically equal any listings. To include these three short sentences in the ALJ's credibility determination regarding the severity of Lynch's pain, when the ALJ draws no connection between these activities and any asserted

15

physical limitations, is to take these sentences entirely out of context. Here again the ALJ has failed to build an accurate and logical bridge from the evidence to her conclusion and this too must be addressed on remand.

### D. Failure to Consider Lynch's Entitlement to Indiana Medicaid

Finally, Lynch argues that the ALJ erred when she did not address the fact that Lynch has been awarded entitlement to Indiana Medicaid. Pursuant to SSR 06-03p, a decision by another governmental agency as to whether a claimant is disabled is not binding on the Commissioner, but the decision nevertheless "cannot be ignored and must be considered," as the "[t]he decisions, and the evidence used to make these decisions, may provide insight into the individual's mental and physical impairments(s) and show the degree of disability determined by these agencies based on their rules." In response, the Commissioner points out that an ALJ is only required to evaluate record evidence "that may have a bearing on her decision," and "[t]he mere fact that [Lynch] allegedly qualified for Medicaid says very little about [Lynch's] condition. Thus, at best, it is not clear how [Lynch's] eligibility for Medicaid could have any 'bearing on' a determination as to whether [Lynch] was disabled." Substantively, the Court tends to agree with the Commissioner; the record divulges nothing outside the simple fact of Lynch's eligibility. Given that the Commissioner is not bound by an outside agency's decision, and noting that there is no evidence of the basis for her eligibility, the Court agrees that it is unclear how this omission could have affected the analysis. Nevertheless, the ruling is unequivocal – other agencies' decisions *cannot* be ignored and *must* be considered, *e.g.*, *Allen v. Astrue*, 843 F. Supp. 2d 920, 935 (S.D. Ind. 2011), and it is not clear from the ALJ's decision that Lynch's Medicaid eligibility was considered. This should be remedied on remand as well.

## VI.    CONCLUSION

The Court acknowledges the large work load under which ALJs labor. Nevertheless, here the ALJ failed to meet even this Court's "minimal articulation" standard. Accordingly, the decision of the Commissioner is **REVERSED and REMANDED** to the Commissioner for further proceedings consistent with this Entry.

SO ORDERED:   08/24/2012

*William T Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification